# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JASON B. GUIDRY,

               Petitioner,

v.

UNITED STATES OF AMERICA,

               Respondent.

Case No. 19-CV-1324-JPS

**ORDER**

On September 12, 2019, Petitioner Jason B. Guidry ("Guidry") filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Docket #1). That motion is now fully briefed. For the reasons explained below, the Court will deny Guidry's § 2255 motion.[1]

## 1. LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), 28 U.S.C. § 2255, a federal prisoner may challenge his sentence if the sentence was imposed "in violation of the Constitution or laws of the United States," the sentencing Court lacked jurisdiction to impose the sentence, "the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."

---

[1] Petitioner complained that the Government appeared to be working from a record to which he did not have access, specifically regarding the Government's citation to the presentencing report (the "PSR"). (Docket #18 at 1–2). However, Guidry would have reviewed the PSR during his case, and he appears to have had access to all other relevant portions of the record, i.e., the sentencing transcript and the plea agreement. (*See* Docket #2 at 2); *see also id.* at 2, (Docket #18 at 13) (referencing exhibits in counsel's objections to the PSR).

## 2.    FACTUAL AND PROCEDURAL BACKGROUND

On March 19, 2013, a federal grand jury charged Guidry in a sixteen-count superseding indictment (the "Indictment"). Case No. 13-CR-16 (Docket #17).[2] Count One charged a conspiracy to possess with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(b)(1)(B), 846; Counts Two through Four and Nine charged sex trafficking in violation of 18 U.S.C. § 1591; Counts Five through Eight, Ten, and Twelve charged "knowingly transport[ing] an individual in interstate commerce . . . with the intent that this individual engage in prostitution" in violation of 18 U.S.C. § 2421; and Counts Eleven and Thirteen through Sixteen charged distribution of controlled substances (heroin, crack cocaine, and powder cocaine) in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). Count One carried a mandatory minimum of five years and permitted a maximum sentence of forty years. 21 U.S.C. § 841(b)(1)(B). Counts Two through Four and Nine carried a mandatory minimum of fifteen years and permitted life sentences. 18 U.S.C. § 1591(b)(1). By contrast, Counts Five through Eight, Ten, and Twelve did not carry mandatory minimums, *see* 18 U.S.C. § 2421 (imposing a ten-year maximum sentence); neither did Counts Eleven and Thirteen through Sixteen, *see* 21 U.S.C. § 841(b)(1)(C) (imposing a twenty-year maximum sentence). If Guidry had gone to trial on the Indictment and lost, he faced a maximum of life in prison on four separate charges.

Guidry was arraigned on the Indictment on March 29, 2013. Case No. 13-CR-16, (Docket #21). At arraignment, the Federal Defender Services represented him. On October 15, 2013, court-appointed attorney Patrick

---

[2]Unless otherwise stated, all citations to the docket are to this case, i.e., Case Number 19-CV-1324.

Cafferty entered a notice of appearance and proceeded to represent Guidry through the remainder of the proceedings. *See id.* (Docket #57). The parties engaged in motion practice, although Guidry expressed some dissatisfaction with his counsel. *See id.* (Docket #99). Nevertheless, by October 10, 2014, the parties had ostensibly reached an agreement: Guidry would enter pleas of guilty to Counts Six, Seven, Ten, (three violations of 18 U.S.C. § 2421) and Count Fourteen (one violation of 21 U.S.C. § 841(a)(1), (b)(1)(C)), none of which carried a mandatory minimum or a life tail. *Id.* (Docket #106). In exchange, the Government would dismiss the remaining twelve counts, which included five charges with mandatory minimums and four charges with potential life sentences. (*Id.* at 5).

The plea agreement included a stipulation to the facts in "Attachment A," which summarized Guidry's conduct with three alleged victims, A.R., M.M., and A.M. (*Id.* at 15–16). It explained that Guidry and A.R. worked together from February to April 2012. During that period, Guidry advertised A.R.'s services on a website called www.backpage.com. Attachment A explains that "[t]he postings include Rockford, Illinois on, among other dates in April 19, 2012 [sic]." (*Id.* at 15). It is not clear if this means the post originated from Rockford, Illinois, or if Guidry advertised that A.R. could work in Rockford, Illinois. In any case, Attachment A asserts that Guidry "drove [A.R.] to a hotel in Rockford, Illinois where she did dates[.]" (*Id.*) Attachment A does not explicitly say that Guidry "took her" to Rockford, Illinois from the Eastern District of Wisconsin. (*C.f. id.* at 15–16) (regarding M.M., "[s]he prostituted in Sheboygan[,] [Wisconsin] as well as in Rockford, Illinois, where Guidry took her to prostitute[,]" and regarding A.M., "Guidry took her to Rockford for the purpose of prostituting").

As to M.M., Attachment A explained that she met Guidry through her then-boyfriend, who purchased heroin from Guidry. M.M. "had been heroin free for approximately six months before she met him"[3] and worked as a stripper. Guidry convinced her that there was more money to be made if she worked for him, and she agreed. In exchange for her sex work, Guidry paid her in cash and heroin, but the profits were not what she had been led to believe. She began using heroin again and became addicted. *Id.*

Notwithstanding the plea, Guidry remained dissatisfied with his counsel. He raised several grievances to the trial judge. (*See* Docket #18-1 at 1–11). By the time of the plea colloquy, however, these grievances were bygone. Case No. 13-CR-16 (Docket #149 at 8–10). At the colloquy, Judge Rudolph Randa examined Guidry under oath and found his plea to be knowing, intelligent, and voluntary. *Id.* at 12–13. The matter was set for sentencing on January 20, 2015. *Id.* at 13.

At sentencing, the Government presented testimony from Detective Tamara Remington ("Remington"), and the court made certain factual findings regarding the applicability of various enhancements. Guidry contends that the following testimony is relevant and bears on his habeas claim regarding counsel's failure to withdraw the plea at sentencing. The Court presents the portions of the sentencing transcript that bear on Remington's testimony below.

---

[3]Although not material for reasons that will be explained below, the Court notes that this is not exactly supported by testimony at sentencing or by the police reports regarding M.M.

Case 2:19-cv-01324-JPS   Filed 11/22/21   Page 4 of 26   Document 23

### 2.1 Testimony at sentencing regarding transferring A.M. across state lines for sex work

Regarding whether A.R. was transported interstate for sex work, Remington answered the following questions during the sentencing hearing:

> Q. To your knowledge, in terms of . . . [A.R.'s] involvement with Mr. Guidry, once she terminated the relationship she moved to Rockford, Illinois?
> A. She had to, because Guidry was staying with her Mom.
> Q. Okay. She left Sheboygan and moved to Rockford?
> A. She just was staying there for a little while, with the intention of -- she wanted to make sure Jason Guidry was out of that Mom's house before she returned. So it wasn't actually like an official move. It was staying for an extended period of time.
> Q. One way or the other, she left and went to Rockford and lived with her father?
> A. Yes.
> Q. After she moved to Rockford, or was staying in Rockford, there was one more weekend, then, where she got together with Mr. Guidry and performed prostitution acts?
> A. He got her and said he needed her to teach the new girls he got. So he had her to show the other ones how to prostitute, because those other ones had never done it.

*Id.* at 82:24–83:17.

> Q. Amanda "R". After this incident in the taxicab where she went down to Rockford to get away from Mr. Guidry, he lured her back into the prostitution trade, didn't he?
> A. Amanda "R"?
> Q. Yes.
> A. Yes.

*Id.* at 94:15–20.

### 2.2 Testimony regarding U.S.S.G. § 3A1.1(b)(1)

Guidry received a two-level enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) for Count Ten, which dealt with his conduct towards M.M.

Section 3A1.1(b) requires a two-level increase "[i]f the defendant knew or should have known that the victim of the offense was a vulnerable victim." In support of this conclusion, the sentencing court heard the following testimony from Remington:

> Q. During the course of the interview with [M.M.], that occurred in the Sheboygan County Detention Center?
> A. I -- I had numerous talks with her, but the first one was at the Detention Center.
> Q. Which is jail, basically?
> A. Yes.
> Q. During that interview, she was one of these victim prostitutes that needed some reassurance that she wasn't going to be treated as a criminal. That she would be treated as a victim in this situation?
> A. She was very scared of Jason and being cut off of heroin. That was all -- that was her main statement.
> Q. She was very hesitant to provide you information?
> A. She was very scared of talking against him, yes.

Case No. 13-CR-16 (Docket #150 at 72:25–73:13).

> Q. As far as [M.M.'s] motive for getting involved with Mr. Guidry, it's your understanding that prior to meeting Mr. Guidry she was a stripper or dancer at a nightclub?
> A. Correct.
> Q. And she was a drug user?
> A. Yes.
> Q. She met Mr. Guidry, and her incentive at that point to get involved with him was that he told her she could make money doing this?
> A. Correct.
> Q. And she believed that associating with him would give her access to heroin?
> A. Yes.
> Q. And she was a heroin user before she met him?
> A. She had been, yes. She had tried it. She had stopped for quite awhile and was proud of that.

*Id.* at 76:17–77:7.

Q. All of these people that we've talked about, [M.M.] . . . , any of them who were interested in purchasing heroin or obtaining heroin could have done that by obtaining it from somebody other than Jason Guidry?

A. They could have, but [M.M] -- you know, Jason was her -- her one source. He was Amanda (redacted) one source. I mean, they didn't -- they wouldn't know where else to go at that time.

Q. They wouldn't. I mean, they all provided you information about other heroin users, other heroin -- people involved in the heroin trade? Yes?

A. Mainly other users, because that's the level they were on.

Q. Okay. Had they been motivated to find a source of heroin other than Jason Guidry, they could have done that?

A. Possibly, yes.

*Id.* at 92:8–23.

The court also heard testimony from an expert witness about the effects of heroin. Ultimately, the sentencing court made the following conclusion as to the vulnerable victim enhancement:

THE COURT: One person was turned from cocaine onto heroin, but even if someone was using heroin before, because of that very fact there's a lower than average vulnerability. Because if one is attracted to heroin to begin with, one can then be tempted to follow the person with the ready and available source . . . . And these are all people whose lives are obviously in a sad state simply because of the fact that those of them that were using heroin were vulnerable, and that puts them in a bad state.

We heard testimony from [the expert witness], who indicated that these people are vulnerable. That there's a physiological and psychological aspect that is of a powerful, powerful nature and characteristic. This, too, makes people -- makes people vulnerable. And the promise of additional heroin, that – under the definition that's contained in that application note 2G1.1 is negation of voluntariness of the victim, particularly the victims who, as the Court has found, were in a lower than

average state of vulnerability.

*Id.* at 103:16–104:11.

In light of this testimony, Guidry claims that there was conflicting evidence in the record regarding whether M.M. used heroin during their time together. He contends that she told a police officer in September 5, 2012 that she was clean "for the whole time she stayed with Jay (Mr. Guidry), and when she was clean she would [p]rostitute and Jay would pay her in cash." (Docket #2 at 14).

Guidry does not cite to anything in the record in support of this quotation, but the Court gleans that he is referring to the police reports detailing interviews with M.M., which are appended to counsel's objections to the PSR as "Exhibit 3." *See* 13-CR-16 (Docket #128 at 7–8) (discussing M.M.'s conversation with the police as recounted in Exhibit 3); *id.* (Docket #128-3) (Exhibit 3 is a set of redacted police reports from August and September 2012 which recount an interview between one of Guidry's workers, with a Bates stamp of "MM" on the lower right-hand corner). These reports generally confirm that the interviewee, presumably M.M., was a heroin user when she and Guidry met. At the beginning of the report, it states:

> Reference [sic] her heroin use, she stated that she started using five years ago daily . . . she was clean for six months . . . she stated that when she got back into using heroin, she started off slow and then it got "bad again." She stated that her heroin use was becoming daily heroin use when she met "Jay" . . . . She said he would "hook me up for free a lot."

*Id.* (Docket #128-3 at 11–12). In the remainder of the report, which spans eight pages, M.M. describes the various characters in Guidry's heroin and sex-work enterprise. All of these names are redacted. At one point,

regarding a redacted name, the police report says, "she meant heroin at first, and then when she stopped doing heroin and she was clean for the whole time she stayed with [Guidry], when she was clean, [Guidry] would give her money." *Id.* at 13–14.

### 2.3 "Force or fear" enhancement pursuant to U.S.S.G. § 2A3.1.

The Government also sought to apply a sentencing enhancement to Counts Six, Seven, and Ten, which would raise the base offense level from 14 to 30. The relevant sentencing guideline for Counts Six, Seven, and Ten (the 18 U.S.C. § 2421 violations) is U.S.S.G § 2G1.1, which establishes a base offense level of 14 but permits a cross-reference to U.S.S.G. § 2A3.1, which establishes a base level of 30, if "the offense involved conduct described in 18 U.S.C. § 2241(a) or (b) or 18 U.S.C. § 2242." U.S.S.G. § 2G1.1(a)(2), (c)(1). In turn, 18 U.S.C. § 2241(a) or (b) and 18 U.S.C. § 2242 each require a showing of trafficking by force or fear. In other words, the Government sought to add an enhancement to the § 2421 violations by contending that Guidry induced his alleged victims to act through force or fear. Guidry's counsel raised a factual objection to this—which was overruled—but not a constitutional objection to the statute on the grounds that "force or fear" is vague.

### 2.4 Sentence and Appeal

Ultimately, the court sentenced Guidry to 120 months for counts Six, Seven, and Ten—the statutory maximum—to run concurrently to one another, plus 179 months as to Count 14 which, recall, carried a maximum sentence of 20 years, for a total term of imprisonment of 299 months. In imposing this above-guideline sentence, the court adopted the enhancements pursuant to U.S.S.G. § 2A3.1(a) (i.e., causing the victims to

engage in sex work by placing them in fear) and U.S.S.G. § 3A1.1(b)(1) (i.e., exploiting a victim's vulnerability).

Guidry filed an appeal in which he challenged the denial of his motions to suppress due to unconstitutional searches, the application of the two sentencing enhancements, and certain vague and conflicting terms of supervised release. *United States v. Guidry*, 817 F.3d 997 (7th Cir. 2016). The Seventh Circuit found that the searches were constitutional and determined that the two enhancements were appropriate. *Id*. at 1005–09. However, the court remanded the matter for resentencing because it agreed that certain conditions of supervised release were vague or conflicting. *Id.* at 1010.

On remand for resentencing before this Court, Guidry moved to withdraw his plea agreement and to strike Count Six from his plea. *See United States v. Guidry*, 738 F. Appx. 368, 368 (7th Cir. 2018). The Court vacated the contested conditions of supervised release and declined to consider Guidry's motions to withdraw and strike the §2421 count, explaining those issues were not properly before the Court. *Id.* Guidry appealed. On September 21, 2018, the Seventh Circuit determined that "Guidry could have challenged his guilty plea or indictment in his original appeal but failed to do so, [therefore] these arguments were waived." *Id.* at 369. It also agreed that, on remand, this Court was limited to correcting the unconstitutional conditions of supervised release and, having vacated them, left no appealable issue for Guidry to raise. *Id.* On September 19, 2019, Guidry filed this motion pursuant to § 2255.

3.    **ANALYSIS**

    3.1    **Timeliness**

    Under the AEDPA, petitioners must file their § 2255 motion within one year of the date of the final judgment. 28 U.S.C. § 2255(f)(1). "[A]

judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction." *Clay v. United States*, 537 U.S. 522, 525 (2003); Sup. Ct. R. 13 (providing 90 days from the entry of judgment to file a writ of certiorari). "[W]here the court [of appeals] remands for a resentencing hearing, which clearly may supply a defendant with the basis for a nonfrivolous appeal, the limitations period does not begin to run until the final judgment is entered following that resentencing." *Woodfolk v. Maynard*, 857 F.3d 531, 542 (4th Cir. 2017) (citations and quotations omitted); *see also Burton v. Steward*, 549 U.S. 147, 156–57 (2007) (explaining, in the context of a § 2254 petition, that the AEDPA's "limitations period did not begin until both [the] conviction *and* sentence became final. . . .") (citations and quotations omitted).

On March 22, 2016, the Seventh Circuit affirmed Guidry's conviction and prison term but remanded the matter for resentencing on certain conditions of supervised release. On October 12, 2017, the Court resentenced Guidry and entered an amended judgment. Case No. 13-CR-16 (Docket #183, #184). Guidry filed a notice of appeal on October 20, 2017, in which he challenged the district court's refusal to allow him to withdraw his plea and dismiss one of the § 2421 counts. (Docket #185). The Seventh Circuit dismissed the appeal on September 21, 2018, explaining that Guidry had waived these grounds by failing to raise them in the original appeal. (Docket #195). For the purposes of the AEDPA's one-year filing requirement, Guidry's conviction became final upon the conclusion of the

direct appeal of his resentencing. *See Woodfolk*, 857 F.3d at 542.[4] Thus, when he filed this habeas petition on September 19, 2019—within one year of the Seventh Circuit's dismissal of his second direct appeal—Guidry's submission was timely.

### 3.2    Procedural Default

"A claim not raised on direct appeal generally may not be raised for the first time on collateral review and amounts to procedural default." *White v. United State*, 8 F.4th 547, 554 (7th Cir. 2021) (citation omitted). However, "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." *Massaro v. United States*, 538 U.S. 500, 509 (2003).

The Seventh Circuit determined that Guidry had waived his claims regarding the plea withdrawal and claim dismissal—therefore, had he sought to proceed on those grounds, they would have been procedurally defaulted. Case No. 13-CR-16 (Docket #195 at 2). However, Guidry's § 2255 motion is stylized as a motion for ineffective assistance of counsel on three grounds: (1) that, given the disparity between Attachment A and Detective Remington's testimony at sentencing, trial counsel was ineffective for either

---

[4]The Court notes that the Seventh Circuit follows the minority of courts in a circuit split regarding whether a second-or-subsequent habeas petition following the imposition of a new sentence may challenge the underlying conviction. *See Kramer v. United States*, 797 F.3d 493, 502 (7th Cir. 2015) (finding that the court lacked jurisdiction under 2255 to review a second habeas petition challenging a previously undisturbed conviction, describing the circuit split on this issue, and noting that "the fundamental question underlying the circuit split" appeared to be: "what constitutes the petitioner's 'judgment'?"). However, because the case is not squarely on point and because neither party discusses it, the Court will address Guidry's petition on the merits.

failing to withdraw the guilty plea at sentencing or failing to interview witnesses before negotiating the plea; (2) that trial counsel was ineffective for failing to raise a constitutional challenge to the "force or fear" enhancement pursuant to U.S.S.G. § 2A3.1, which relies on conduct described in 18 U.S.C. § 2242; and (3) that trial counsel was ineffective for failing to challenge the vulnerable victim sentencing enhancement as applied to M.M. in light of the facts in the record suggesting that she was not addicted to heroin during their relationship. As raised, and, as the Government concedes, these claims are not procedurally defaulted. The Court will address each ground in turn.

### 3.3   Sixth Amendment Violation – Count Six

The Court of Appeals's opinion in *Blake* neatly summarizes the exacting standard for ineffective assistance of counsel claims:

> A party asserting ineffective assistance of counsel bears the burden of establishing two elements: (1) that his trial counsel's performance fell below objective standards for reasonably effective representation, and (2) that counsel's deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 . . . (1984)[.]
>
> To satisfy the first element of the *Strickland* test, appellant must direct the Court to specific acts or omissions by his counsel. In that context, the Court considers whether in light of all the circumstances counsel's performance was outside the wide range of professionally competent assistance. The Court's assessment of counsel's performance is "highly deferential[,] . . . indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" [*Id.* at 689.]
> . . .
> To satisfy the second *Strickland* element, appellant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have

Case 2:19-cv-01324-JPS   Filed 11/22/21   Page 13 of 26   Document 23

been different, such that the proceedings were fundamentally unfair or unreliable. A reasonable probability is defined as one that is sufficient to undermine confidence in an outcome.

*Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) (citations and quotations omitted).

Guidry contends that it was unreasonable for his counsel to fail to move to withdraw the plea given Remington's testimony that A.R. had moved to Illinois voluntarily, which contradicted the facts in the plea agreement. The Government contends that Remington's testimony was not inconsistent with trafficking, but this argument overlooks 18 U.S.C. § 2421's requirement that the perpetrator move the victim interstate. According to Remington's testimony, although Guidry may have pimped A.R. in Wisconsin and Illinois, he did not traffic her *from* Wisconsin *to* Illinois for the purpose of sex work.

To be sure, Remington's testimony is not dispositive—perhaps, at trial, A.R. or her mother would have told a different story—but the discrepancy raises the specter of reasonable doubt, and, with it, a difficult issue. On the one hand, the courts—and parties—have a strong interest in the finality of plea agreements. *Hugi v. United States*, 164 F.3d 378, 381 (7th Cir. 1999) ("Courts take the plea process seriously and hold defendants to their representations."). On the other hand, there is no public interest in incarcerating someone who is innocent. *See McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013) ("Sensitivity to the injustice of incarcerating an innocent individual should not abate when the impediment is AEDPA's statute of limitations.").

Against this backdrop, *Strickland* instructs the Court to consider whether Guidry's counsel acted reasonably. Thus, the Court must decide

whether it was it reasonable for counsel to learn of evidence undermining the factual predicate of one of the charges and, nevertheless, fail to move to withdraw the plea. In this case, given "all the circumstances [of] counsel's performance," the Court finds that counsel acted reasonably. *Blake*, 723 F.3d at 879. As part of the plea bargain, Guidry admitted guilt as to four counts in exchange for dismissing twelve counts—including four with a life tail. If counsel were to have withdrawn the plea based on the lack of factual predicate for Count Six, then all original charges would have returned to the negotiation table. Perhaps Count Six was fightable at trial based on Remington's testimony and understanding of the events, but what of Count Nine, which carried a mandatory minimum sentence of fifteen years and the possibility of life in prison? *See* 18 U.S.C. § 1591(b). Moreover, would counsel have opened Guidry to a perjury charge for lying under oath about the veracity of the facts underlying the plea?

This is the sort of risk analysis in which reasonable counsel would have engaged. It is impossible to know exactly what counsel was thinking, but it is not this Court's duty to "second guess" counsel's conduct. *Strickland*, 455 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). Failing to withdraw a guilty plea based on testimony at sentencing is not outside the bounds of reason given the circumstances of the case and the cost-benefit analysis of entering a plea versus proceeding with trial. Indeed, counsel may well have realized what Remington's testimony implied but did not want to undo an otherwise relatively favorable guilty plea, particularly if, in counsel's estimation, there was

sufficient evidence to risk conviction on another count that carried a longer sentence. *See Hugi*, 164 F.3d at 382 ("For all we can tell, [defendant and his attorney] well knew that the . . . charge to which he pleaded was weak, but it may have seemed an attractive bargain compared to the alternatives."). At the end of the day, Guidry has not explained why his counsel's conduct was unreasonable given the facts and circumstances of the case.

Having determined that counsel acted reasonably, the Court has disposed of the ineffective assistance of counsel claim. In the interest of thoroughness, however, the Court will also explain why it appears that Guidry cannot establish prejudice. For instruction, the Court looks to *Lewis v. Peterson*, a § 2255 case in which the Seventh Circuit evaluated a claim for actual innocence based on the Supreme Court's interpretation of 18 U.S.C. § 924(c). For background, in *Bousley v. United States*, the Supreme Court held that a petitioner could "get his conviction set aside . . . if he proves that he is innocent both of the [original] offense of which he was convicted . . . and of any 'more serious' charge that the government dropped or otherwise forwent in the course of plea negotiations." *Lewis v. Peterson*, 329 F.3d 934, 936 (7th Cir. 2003) (discussing *Bousley v. United States*, 523 U.S. 614, 621–24 (1998)). The *Lewis* Court extended *Bousley* to require a petitioner prove actual innocence of the original offense and any "more serious" *or* "as serious" charge that the Government dismissed in exchange for a plea. *Id.* at 937. The Seventh Circuit reasoned that "only if [the valid, dismissed count] charges a *less* serious crime is there a strong reason to believe that the defendant was punished more severely by virtue of having pleaded guilty to the count later learned to be invalid." *Id.* (emphasis added).

That logical inquiry—whether a defendant was punished more severely by virtue of having pled guilty to an invalid count—applies here:

Case 2:19-cv-01324-JPS   Filed 11/22/21   Page 16 of 26   Document 23

even if Count Six were invalid,[5] Guidry cannot establish prejudice based on his counsel's failure to withdraw the plea. By the sentencing hearing, the Government knew that Guidry was willing to negotiate a plea, and there were no fewer than *twelve* other charges that were as serious or more serious that the Government could have used to negotiate a similar (or worse) plea. In other words, Guidry has not established that he was prejudiced by his counsel's failure to withdraw the plea.[6]

Guidry also argues that defense counsel should have interviewed A.R., her parents, and Remington, among others, before advising him to plead guilty to Count Six. Counsel's decision not to interview witnesses pre-plea is not unreasonable—it is unlikely that the average defense attorney would conduct a trial-level investigation if the defendant was interested in a plea bargain, and it is not within this Court's purview to second-guess trial counsel's decisions. *Strickland*, 455 U.S. at 689. The question of whether the lack of investigation is prejudicial is bound up with the reasonableness inquiry: while knowing how a witness will testify at trial might assist a defendant's decision to take a plea, at the end of the day, Guidry was in the best position to know whether he trafficked someone. If he knew the evidence would, or could, show his innocence, it was his responsibility to communicate that to his attorney and opt against pleading guilty to those charges.

---

[5]The Court makes no finding on that issue.

[6]Assuming, *arguendo*, that the plea would have remained in place even if Count Six were dismissed, Guidry's challenge, at least as far as sentencing is concerned, is completely academic because the sentences imposed in Counts Six, Seven, and Ten run concurrently to one another. Thus, even if Count Six were dismissed, he would still be serving two other concurrent 120-month sentences.

Guidry also contends that his guilty plea to Count Six was not intelligent or voluntary considering counsel's alleged shortcomings, which are described above. A valid guilty plea must be made voluntarily, intelligently, and knowingly. *Brady v. United States*, 397 U.S. 742, 747 n.4 (1970). "A plea is voluntary when it is not induced by threats or misrepresentations and the defendant is made aware of the direct consequences of the plea." *United States v. Jordan*, 870 F.2d 1310, 1317 (7th Cir. 1989) (citing *Brady*, 397 U.S. at 755). A plea is knowing and intelligent "when the defendant is competent, aware of the charges, and advised by competent counsel." *Id.* The focus of any challenge to the colloquy would have been on whether Guidry's plea was voluntary when it was entered, not whether he rethought the wisdom of the plea later. *See United States v. Underwood*, 174 F.3d 850, 854 (7th Cir. 1999). Moreover, "a guilty plea is no less voluntary just because the defendant becomes disgruntled about the outcome at sentencing." *United States v. Arroyo*, 219 F. App'x 516, 519 (7th Cir. 2007) (citation omitted).

Guidry's claim that his plea was not intelligent or voluntary hinges on his argument that his counsel did not competently advise him of the terms and consequences of the plea. However, a review of the transcript of the plea colloquy, at which Guidry answered questions about the plea while under oath, refutes this argument. *See* 13-CR-16 (Docket #149 at 5:2–6) (acknowledging that counsel reviewed waiver of trial rights); *id.* at 8:1–8 (pleading to the facts set forth in Attachment A); *id.* at 9:1–10:15 (discussing his relationship with counsel and his agreement with the decision to plea); *id.* at 10:23–11:16 (reviewing the maximum penalties associated with the plea which, in this case, included a fifty-year term of imprisonment). At the time, Judge Randa determined that Guidry was represented by competent

counsel and had entered the plea knowingly, intelligently, and voluntarily. *Id.* at 12:24–13:2. Guidry has offered no reasonable basis for the Court to disturb that conclusion.

### 3.4     Sixth Amendment Violation – Section 2242 Enhancement

Guidry next contends that his counsel unreasonably failed to raise a constitutional challenge to the imposition of the "force or fear" enhancement pursuant to U.S.S.G. § 2A3.1(a)(2). To reiterate, this enhancement applies to interstate travel offenses if a defendant "cause[d] another person to engage in a sexual act by threatening or placing that other person in fear." 18 U.S.C. § 2242; *United States v. Guidry*, 817 F.3d 997, 1008 (7th Cir. 2016) (upholding the cross-reference to § 2A3.1 based on evidence "that Guidry exercised mental and emotional power over his victims, in addition to physical violence").

Guidry contends that counsel should have challenged 18 U.S.C. § 2242 as void for vagueness. In support, Guidry points to the Seventh Circuit's acknowledgement that courts "define the concept of 'fear' broadly[.]" *United States v. Henzel*, 668 F.3d 972, 977 (7th Cir. 2012) (citing and quoting *United States v. Boyles*, 57 F.3d 535, 544 (7th Cir. 1995)). Thus, Guidry argues, in light of *Henzel* and the lack of any precedent to the contrary, it was unreasonable for counsel to fail to challenge the statute.

The "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at

hand; the statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).

In the present case, there is sufficient input from the Seventh Circuit to support a conclusion that counsel's decision *not* to bring a void-for-vagueness challenge was reasonable. For example, in *Henzel*, the Seventh Circuit approvingly cited a Ninth Circuit case that "rejected [a defendant's] contention that § 2242 is unconstitutionally vague because it does not define 'fear.'" 668 F.3d at 977 (citing *United States v. Gavin*, 959 F.2d 788, 790–91 (9th Cir. 1992)). Additionally, in *United States v. Cherry*, the Seventh Circuit reviewed a void-for-vagueness challenge for plain error and noted that, because section 2241(1) requires a defendant to "knowingly induce the prohibited conduct," the defendant bore "an especially heavy burden in raising his vagueness challenge." 938 F.2d 748, 754 (7th Cir. 1991) (quotations omitted).

In short, the statute's scienter requirement makes it extremely difficult for a defendant to claim that the statute did not give constitutionally adequate notice of the proscribed conduct. *See United States v. Jackson*, 935 F.2d 832, 838 (7th Cir. 1991) (citations and quotations omitted). Moreover, an attorney is not ineffective for failing to pursue every available recourse. *See Johnston v. Mitchel*, 871 F.3d 52, 63 (1st Cir. 2017). Accordingly, it would have been reasonable for counsel to decline to challenge the constitutionality of the statute.

Nor can the Court find that Guidry was prejudiced by this course of conduct. On appeal, the Seventh Circuit determined that the facts in evidence supported application of the enhancement. *Guidry*, 817 F.3d at 1008. "[T]here is no reason to suppose that the Seventh Circuit would have looked favorably on an 'as applied' vagueness challenge" since it had no

trouble upholding the enhancement's application in the first instance. (Docket #6 at 12).

### 3.5 Sixth Amendment Violation – Vulnerable Victim Enhancement

Guidry's final claim of ineffective assistance of counsel is based on counsel's failure to object to or correct the sentencing court's use of inaccurate and false information, particularly as it related to the vulnerable victim enhancement imposed pursuant to U.S.S.G. § 3A1.1(b)(1).[7] "[A] defendant has a constitutional due process right to be sentenced based on accurate information." *Promotor v. Pollard*, 628 F.3d 878, 888 (7th Cir. 2010). "[N]ot all inaccuracies deprive a defendant of due process; the incorrect information must be 'materially untrue'. . . and a defendant . . . must establish that the sentencing court also *relied* on the critical inaccurate information." *Id.* (citations and quotations omitted). If a district court "selects a sentence based on clearly erroneous facts," it commits "significant procedural error." *United States v. Chatman*, 805 F.3d 840, 843 (7th Cir. 2015) (quoting *United States v. Corona-Gonzalez*, 628 F.3d 336, 340 (7th Cir. 2010)).

Guidry's primary argument is that M.M. gave police information that contradicted evidence that the Government presented to the sentencing court. Specifically, Guidry claims that, in early September 2012, M.M. told detectives that she had stopped doing heroin, was "clean" the entire time she engaged in sex work for Guidry, and was paid in cash. (Docket #2 at 14); (Docket #18 at 13). Thus Guidry contends that his counsel

---

[7]Guidry also contends that his sentence regarding transporting A.R. was based on inaccurate information. The Court disposed of this contention in Section 3.3, *supra*, when it determined that Guidry knowingly, intelligently, and voluntarily pleaded to the conduct in the plea, and it declines to revisit the matter.

Case 2:19-cv-01324-JPS   Filed 11/22/21   Page 21 of 26   Document 23

was ineffective for failing to raise this inconsistency to challenge the enhancement.

Generally, when a sentence is vacated because the sentencing court relied on misinformation, that "misinformation" amounts to more than merely conflicting testimony. *See United States v. Tucker*, 404 U.S. 443, 448–49 (1972) (remanding a case for resentencing where a sentencing judge considered the defendant's three prior convictions, but two of those convictions were later determined unconstitutional); *United States v. Barnes*, 907 F.2d 693, 696 (7th Cir. 1990) (remanding a case where a sentencing judge appeared to rely on inadmissible hearsay statements from a confidential informant). Indeed, "reliable hearsay is admissible at sentencing." *United States v. House*, 110 F.3d 1281, 1286 (7th Cir. 1997) (citations omitted). "To use evidence during sentencing, the judge must only decide that the evidence is reliable and must allow the defendant an opportunity to rebut." *Id.* (quoting *United States v. Nelson*, 39 F.3d 705, 710 (7th Cir. 1994)).

The offending hearsay statements, in this case, are those stating that Guidry exploited M.M.'s heroin addiction to induce sex work. Guidry's counsel submitted robust objections to the presentencing report, in which he challenged the use of M.M.'s heroin addiction as a basis for the vulnerable victim enhancement. (Docket #128 at 7–9). The objections addressed the statements that M.M. made to police. *Id.* at 7–8. The objections did not raise any inconsistencies in the police reports.

The police reports described how the interviewee—presumably M.M.—had been a daily heroin user when she met Guidry and "stated Guidry provides her with heroin and it is a light brown powder." (Docket #123-3 at 6). The same report stated that M.M. "was paid mainly in heroin . . . . [A]fter that she quit using." *Id.* She also stated that Guidry would "pay

half in money and half in heroin." *Id.* at 7. Indeed, she acknowledged, "[a]ll of the girls that are prostitutes for Guidry are into heroin." *Id.* In an earlier interview, she also stated that "her heroin use was becoming daily heroin use when she met [Guidry]." *Id.* at 12. She explained that he "withheld heroin from her until she started prostituting for him." *Id.* at 13. She also mentioned that she "moved in with Jason and then moved out[.]" Later, as to a redacted person—possibly M.M.—the report stated, "she was clean for the whole time she stayed with Jay, when she was clean, Jay would give her money." *Id.* at 13–14.

Assuming all of these statements relate to M.M., they would seem to contradict Attachment A, which stated that M.M. was clean when she met Guidry but later started using heroin again. However, the police report's statement that M.M. was clean "the whole time she stayed with" Guidry is not inconsistent with the overall report, which describes the circumstances of a woman who used heroin on-and-off, struggled with inconsistent housing, and engaged in sex work in exchange for money and heroin. The fact that M.M. may have been clean during "the whole time she stayed with" Guidry does not negate her allegations that she used heroin during the period she worked with him and that, at one point, he withheld heroin from her in order to induce her into sex work.

Moreover, the discrepancy between the police reports and Attachment A does not disturb Judge Randa's application of § 3A1.1(b)(1) because he focused on the exploitable vulnerabilities of heroin users, not on whether M.M. was clean when she met Guidry. The Seventh Circuit already observed that "the enhancement was appropriate due to Guidry's knowledge and exploitation of M.M.'s heroin addiction." *Guidry*, 817 F. 3d at 1008. In other words, it does not actually matter when M.M. was clean—

what matters is that she was a heroin addict, she used heroin for at least some portion of her time with Guidry, and Guidry used that knowledge to induce her into sex work. There is nothing in the record that contradicts that.

Counsel was not ineffective for failing to make the objections that Guidry wanted—it appears that counsel raised appropriate objections in light of the facts presented in the police reports and the PSR. (Docket #128 at 7–9). The sentencing court had broad discretion to consider hearsay evidence, and it found, based on the record, that Guidry exploited M.M.'s heroin addiction in order to induce her into sex work. Based on the record before the Court, there is no constitutional error.

4.     **CONCLUSION**

For the reasons explained above, the Court will deny Petitioner's motion to vacate, set aside, or correct his sentence pursuant to § 2255, (Docket #1). The Court will deny as moot Guidry's motion to alter judgment as moot in light of this Order. (Docket #17). The Court will also deny Guidry's motion to appoint counsel, (Docket #16), on the grounds that, when all is said and done, he did not need counsel—although he ultimately lost his motion, the briefing was very well done.

Under Rule 11(a) of the Rules Governing Section 2255 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), Guidry must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."

*Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). Although Guidry's petition is vigorously argued, in light of the well-settled principles governing the disposition of Guidry's claims, as outlined above, the Court cannot fairly conclude that reasonable jurists would debate whether his motion should be decided differently; as a consequence, the Court must deny a certificate of appealability to him.

Finally, the Court closes with some information about the actions that Guidry may take if he wishes to challenge the Court's resolution of this case. This order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within thirty days of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See id.* 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *Id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Accordingly

**IT IS ORDERED** that Petitioner's motion to set aside, vacate, or correct his sentence pursuant to § 2255 (Docket #1) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Petitioner's motion to appoint counsel (Docket #16) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Petitioner's motion to alter judgment (Docket #17) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that a certificate of appealability be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 22nd day of November, 2021.

The Clerk of Court is directed to enter judgment accordingly.

BY THE COURT:

_____

J.P. Stadtmueller

U.S. District Judge